IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 17, 2018 Session

## RONALD HENRY AHO v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Warren County**
**Nos. F-13913, F-13974     Larry B. Stanley, Jr., Judge**

_____

**Nos. M2017-00163-CCA-R3-PC**

_____

In 2012, the Warren County Grand Jury indicted Petitioner, Ronald Henry Aho, in case number F-13913 for aggravated burglary and theft of property over $1,000 but less than $10,000. Petitioner was also indicted in case number F-13974 for two counts each of aggravated burglary and theft of property over $1,000 but less than $10,000. In January 2014, Petitioner entered best interest guilty pleas in case numbers F-13913 and F-13974 to a total of two counts of aggravated burglary and two counts of theft over $1,000 but less than $10,000 in exchange for the dismissal of the remaining charges and the dismissal of charges contained in three additional indictments. Pursuant to the plea agreement, Petitioner was sentenced to serve a total effective sentence of twenty-three years, with the first fifteen years to be served at sixty percent release eligibility and the last eight years to be served at forty-five percent release eligibility. Petitioner filed a petition for post-conviction relief, alleging that he received ineffective assistance of counsel and that his pleas were unknowingly and involuntarily entered. Following an evidentiary hearing, the post-conviction court denied relief. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

G. Jeff Cherry and Christopher Beauchamp (on appeal), Lebanon, Tennessee, and Samuel F. Hudson (at hearing), Dunlap, Tennessee, for the appellant, Ronald Henry Aho.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Lisa Zavogiannis, District Attorney General; and Randal Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Plea Submission Hearing*

On January 29, 2014, Petitioner entered a best interest guilty plea, as a Career Offender, to aggravated burglary and theft over $1,000 in case number F-13913 and received concurrent sentences of fifteen years and twelve years, respectively, to serve in the Department of Correction. In case number F-13974, Petitioner entered a best interest guilty plea, as a Range III Persistent Offender, to one count each of aggravated burglary and theft over $1,000. Pursuant to the plea agreement, Petitioner received concurrent sentences of eight years with forty-five percent release eligibility on each count to be served consecutively to his effective fifteen-year sentence with a sixty percent release eligibility in case number F-13913, for a total effective sentence of twenty-three years in the Department of Correction. Based on Petitioner's plea, the State dismissed the two remaining counts in case number F-13974, as well as the charges against Petitioner in case numbers F-13975, F-13976, and F-13977.

At the plea submission hearing, the State recited the following factual basis for case number F-13913:

> [O]n October 18 of 2012, the State's proof would have been that [Petitioner] broke into a home on Spring Street here in Warren County owned by Ms. Sheila Bates. Once inside, [he] obtained several items of property including several items of jewelry with a combined value in excess of a thousand dollars. [He] [l]eft the house with those items and was able to elude the police in that incident.

The State recited the facts of case number F-13974, as follows:

> [A] burglary [also] occurred [] on October 18 of 2012 of a house on 70 Underwood Road. Taken during that burglary were a Nintendo Wii, a PlayStation 2, approximately 100 DVD and BluRay videos, an HP Compaq notebook computer, a quantity of oxycodone and several other items and that burglary and theft occurred here in Warren County. The State's proof would be that a short time later [Petitioner] was found in possession of that stolen property.
>
> . . . .

- 2 -

The State's proof . . . would be . . . that they were found at a residence that [Petitioner] was associated with and there would have been proof linking him to that property.

When questioned by the trial court, Petitioner agreed that he went over the plea documents in both cases "thoroughly" with trial counsel. Petitioner testified that he understood the nature of the charges to which the pleas were offered, the minimum and maximum sentence on each charge if convicted, his right to counsel at every stage of the proceedings, his right to plead not guilty, his right to a jury trial, his right to confront adverse witnesses and bring his own witnesses, his right to remain silent, and his right to appeal any resulting conviction or sentence. In accepting the terms of the plea agreement, Petitioner affirmed that he was waiving each of those rights. He also agreed that he was entering his pleas freely and voluntarily. Petitioner denied that he was entering the pleas because he had been threatened to do so. The trial court found that Petitioner understood his rights and made a knowing, voluntary, and understanding waiver of his rights by pleading guilty. The trial court additionally found that there was a factual basis for Petitioner's pleas.

### Post-Conviction Proceedings

On January 30, 2015, Petitioner filed a timely pro se petition for post-conviction relief, asserting that he was denied the effective assistance of counsel and that his best interest plea was unknowing and involuntary due to Petitioner's mental incompetence. On February 8, 2015, the post-conviction court entered a preliminary order appointing counsel for Petitioner. Petitioner later retained counsel to represent him. On May 27, 2015, Petitioner, through counsel, filed an amended petition for post-conviction relief.

At an evidentiary hearing on the petition, Bud Sharp testified that he had been practicing law for seven years when he was retained by Petitioner's parents to represent Petitioner in case number F-13913. Mr. Sharp stated that he met with Petitioner twice in a three-week period regarding the case. He stated that he may have filed a discovery motion but did not investigate any witnesses because he was on the case for only four weeks. He stated that the case had not yet been set for trial when he withdrew from representing Petitioner. Mr. Sharp recalled that he talked to Petitioner about entering a best interest plea based on Petitioner's extensive prior record, which consisted of "[forty] something felony convictions[,]" the unpredictability of a jury trial, and the strength of the State's proof. Specifically, Mr. Sharp recalled from the police report that the victim in case number F-13913 "pulled up to her house and [Petitioner] was in the house, came out of the house, the car was sitting in the driveway, and she got his tag number and he left."

Although Mr. Sharp remembered Petitioner discussing matters unrelated to his case, Mr. Sharp stated that this was not unusual because many of his clients tended to go off subject. Mr. Sharp stated that Petitioner was "very intelligent[.]" Mr. Sharp stated that he represented Petitioner in 2007 on a burglary and theft case and that Petitioner was mentally competent when he entered his guilty plea on the case. He acknowledged that he was aware Petitioner was drawing SSI disability, but he stated that he was not aware of Petitioner's being diagnosed with post-traumatic stress disorder or anti-social personality disorder. Mr. Sharp stated that, if the case had proceeded to trial, he may have had Petitioner undergo a forensic evaluation based on the Petitioner's drawing disability. Mr. Sharp denied telling Petitioner he should talk with the prosecutor. He stated, "[Petitioner] may have written a letter to [the prosecutor]. My clients do not talk to the State period. I do not want my clients talking to the State even though they may have good intentions." Mr. Sharp recalled that Petitioner's parents retained co-counsel, Steve Roller. Mr. Sharp talked to Mr. Roller over the phone about who would ultimately handle the case and whether a plea agreement should be negotiated. They did not discuss trial strategy. Mr. Sharp withdrew from the case on April 29, 2013.

Steve Roller testified that he had been a practicing attorney since 1978. Mr. Roller was retained by Petitioner's parents to represent Petitioner after dismissing Mr. Sharp for some unspecified reason. Mr. Roller recalled that a trial date had been set for one of Petitioner's cases. Mr. Roller did not recall Petitioner's parents' expressing concerns about Petitioner's mental health.

Mr. Roller testified that he met with Petitioner in the Warren County Jail more than once. During this time, Petitioner told Mr. Roller that he wanted to meet with the prosecutor; however, the State was not interested in meeting with him. Mr. Roller acknowledged that he scheduled a meeting with Petitioner and investigators Jason Rowland and Barry Powers to discuss facts about "certain different cases[,]" despite Petitioner not having an immunity agreement. Mr. Roller stated that he advised Petitioner not to meet with the investigators, but Petitioner "insisted" on meeting with them.

Mr. Roller denied having any knowledge of Petitioner's mental health issues. However, he recalled an incident in which Petitioner lost his temper and acted in such a way that guards interrupted their meeting and took Petitioner to his cell. Mr. Roller testified that Petitioner demonstrated his understanding of the nature of the charges against him by asking and answering relevant questions about the case. Petitioner was "very educated with legal procedure and trial" due to his extensive criminal record. Based on Petitioner's participation in his defense, Mr. Roller did not see the need to have Petitioner undergo a forensic evaluation.

Mr. Roller recalled that he was the subject of a complaint Petitioner filed with the Board of Professional Responsibility (BPR). In his response to the complaint, Mr. Roller stated that Petitioner had serious mental problems and that Petitioner had "a mental breakdown at the jail[.]" Mr. Roller testified, however, that he was attempting to describe the incident at the jail in which Petitioner lost his temper. Despite his letter to the BPR, Mr. Roller did not believe that Petitioner lacked competency to participate in his own defense. Mr. Roller acknowledged that he was required by the BPR to refund a substantial amount of the money paid by Petitioner's parents for his representation.

Christopher Stanford testified that, at the time of the post-conviction hearing, he had been practicing law for approximately nine years. He stated that about fifty percent of his practice involved defending individuals charged with criminal offenses. Mr. Stanford recalled that he was retained by Petitioner's parents in 2013 to represent Petitioner on his charges in multiple indictments. Petitioner's parents also retained Lee Nettles as a defense investigator. After being retained, Mr. Stanford and Mr. Nettles met with Petitioner at a prison in West Tennessee for approximately three hours. Mr. Stanford also obtained copies of the State's discovery. Mr. Stanford recalled how knowledgeable Petitioner was about his cases, and he testified that he observed nothing in Petitioner's behavior during their discussions to make him concerned about Petitioner's mental health and to warrant a forensic evaluation. He explained:

> . . . I never once had an inkling that [Petitioner] was unable to assist me with his defense. In fact, he was probably – he seemed fairly well-versed in the law. He seemed fairly able to point us in particular directions, able to give us theories of defense and so while he did have some scattered thought processes, . . . I mean, he would go down a rabbit trail and we would have to redirect him back to the main issue but other than that I didn't notice anything about him that gave me cause for concern.

Mr. Stanford testified that he learned of Petitioner's extensive prior record when the State filed its "Notice of Intent to Use Conviction for Impeachment." He recalled that the State elected to proceed to trial first on case number F-13913. He explained that, once the State made its election, he and the defense investigator primarily focused their investigative efforts on that case. Mr. Stanford recalled that he met with Petitioner at the Warren County Jail after Petitioner was transferred to the jail about a week before trial. He met with Petitioner "several times in a three[-]day period" to prepare Petitioner for trial.

Initially, the State refused to make a settlement offer, but Mr. Stanford eventually convinced the prosecutor to make Petitioner an offer. He explained:

[I]t was my decision at that point that Petitioner needed to explore all reasonable offers before he made a decision about trying these cases[.] [I]t was my understanding that the DA wasn't going to stop [trying Petitioner's cases] until [the State] had the number that they wanted as far as sentencing goes. The initial offer was not acceptable to Petitioner.

During Petitioner's time in the Warren County Jail, Mr. Stanford approached the prosecutor and requested an agreement to continue the trial so that the parties could explore reaching a negotiated settlement as Mr. Stanford could not adequately prepare for trial if he focused on plea negotiations. He spent the next two to three days, in January 2014, going back and forth between the prosecutor and Petitioner to settle the case.

Mr. Stanford remembered an individual named Joe Holland.[1] He recalled that Petitioner wanted Mr. Holland charged with theft based on information Petitioner provided to Mr. Stanford and Mr. Nettles. Petitioner was adamant that Mr. Holland was criminally responsible for the offenses pending against Petitioner. Petitioner expressed this belief to Mr. Stanford in person and through a thirteen-page letter written by Petitioner, in which Petitioner stated that he expected Mr. Holland to be charged before Petitioner's trial. When pressed about whether anyone in Mr. Sanford's office had investigated Mr. Holland, Mr. Stanford said that he did not personally conduct the first interview with witnesses but stated that Mr. Nettles would have done that. Based on Petitioner's thirteen-page letter, Mr. Stanford and Mr. Nettles investigated people "surrounding Joe Holland." Mr. Stanford believed that it would be helpful to talk to Mr. Holland's associates because they might be more willing to share information that Mr. Holland was the person who had committed the crimes. Mr. Stanford recalled that he received a letter from Barry McCormick, which indicated that certain stolen items had been purchased from Mr. Holland.

Mr. Stanford testified that he made a "strategic decision" that he needed to get ready for one trial—the first case set for trial—and that he and Mr. Nettles needed to focus the investigation on the individuals involved in that case. Regarding Petitioner's plea in case number F-13974, Mr. Stanford explained:

The DA wanted a plea to the first case. That [case] was not an option. That was going to be part of the plea deal. [The prosecutor] . . . didn't care which case [Petitioner] pled to after that. So we put the ball in [Petitioner's] court and said, you pick. Which case do you want to plead to? And [Petitioner] wanted to plead to . . . [case number F-13974].

---

[1] The record reflects that Mr. Holland was listed on the indictment in case number F-13974 as a witness for the State.

Mr. Stanford testified that Petitioner was "looking at a hundred plus years" based on all the pending charges. He told Petitioner he would "be happy to try [the] case" but that he wanted to also explore plea negotiations with the State. He explained that, originally, the State's plea offer included a much higher sentence but that Mr. Stanford "eventually worked it down[.]" He talked to Petitioner about the facts of the case, the perception of the jurors given those facts, and "what we thought the jury was likely to do with that case[.]" Mr. Stanford believed that, as Petitioner realized his considerable liability, Petitioner's mood began to "shift[.]" Petitioner was "tearful," "angry," and "very upset." Mr. Stanford stated that Petitioner's

> main concern was that he get out of prison or that . . . all these charges be dropped so he could spend the rest of his life with his lovely parents and I think he became very sad and very tearful when he realized that [there] might be a possibility that he might be in prison longer than they might live.

Mr. Stanford explained that he had not subpoenaed witnesses the week before the scheduled trial because the defense could not come up with any witnesses other than character witnesses like Petitioner's parents and Shelia Thompson. He explained that Ms. Thompson was the only witness that the defense could find that corroborated Petitioner's version of events, but she would have "basically regurgitated . . . what [Petitioner] had told her[.]" Mr. Stanford recalled that the victim in case number F-13913 was "clear as [] could be that it was [Petitioner]" who had been in her driveway.

Mr. Stanford explained that most of his communication with Petitioner was conducted through Petitioner's parents and through letters that Petitioner sent to Mr. Stanford. Mr. Stanford denied that Petitioner's parents tried to set up a phone account with him to use to communicate with Petitioner. Mr. Stanford stated that Mr. Nettles never advised Petitioner that "if you don't accept this plea then I'm going to have to go out now and start subpoenaing witnesses[.]" He recalled that, on the day of the plea, the court clerk or the trial court indicated that they needed to know if Petitioner intended to enter the plea by a certain time that day so that the court would know whether or not to call in the jury. However, there was not a deadline on the plea negotiations. Mr. Stanford explained that the trial court would have granted a continuance because they had spent so much time in plea negotiations rather than trial preparation. Mr. Stanford had advised Petitioner not to testify based on Petitioner's prior record. He stated that, once he explained to Petitioner the details of his investigative findings and what the State's proof would be at trial, Petitioner told Mr. Stanford, "[G]et me the best number you can get me[.]"

Mr. Stanford acknowledged that he did not file a motion challenging the State's use of Petitioner's prior convictions to impeach Petitioner at trial. He agreed that many of Petitioner's prior convictions were very similar to the charges Petitioner was facing. Mr. Stanford recalled that he and Mr. Nettles met several times to review and organize discovery before the three-hour meeting with Petitioner. Mr. Stanford recalled that their investigation showed that the State had a witness that would testify that Petitioner possessed a weapon. The witness indicated Petitioner tried to give her two firearms. Because of his substantial practice in federal court, Mr. Stanford was "very concerned" that the federal prosecutors might seek to charge Petitioner under the Armed Career Criminal Act, in which case Petitioner "would have been looking at . . . probably [thirty] to life." When Mr. Stanford approached the State about plea negotiations, Mr. Stanford had a "gentlemen's agreement" with the prosecutor that the prosecutor would not report the firearms offense to the federal prosecutors. Mr. Stanford indicated that this was a "big part" of why Petitioner chose to plead guilty to the two indictments.

Mr. Stanford testified that Mr. Nettles spent over sixty hours investigating Petitioner's cases prior to the plea and then spent an additional twenty hours after the plea trying to secure an indictment against Mr. Holland in Coffee County. Mr. Stanford stated that Petitioner wanted to go to trial until the prosecutor agreed to enter into plea negotiations. Petitioner then wanted to explore the possibility of a plea. Mr. Stanford stated, "Once he realized that the State was willing to make an offer to him he was very interested in how low we could get the number." Mr. Stanford testified that he knew the prosecutor would not object to a continuance of the trial and testified that he told Petitioner about a possible continuance.

Mr. Stanford said that he did not believe he would have been able to cross-examine Mr. Holland about any pending charges he was facing.[2] He did not think that information would have been relevant and admissible. Petitioner provided Mr. Stanford with a letter signed by Barry McCormick dated February 4, 2013, indicating Mr. Holland's potential "guilt and involvement in some of the matters."[3]

---

[2] At the post-conviction hearing, Petitioner made an offer of proof regarding Mr. Holland's conviction, submitting a Coffee County Grand Jury indictment charging Mr. Holland with theft over $10,000 and a judgment of conviction showing that Mr. Holland pled guilty to the charge on January 20, 2016. It is not clear from the offer of proof the nature of Mr. Holland's role in that offense. Moreover, although it appears that some of the victims listed in the indictment correspond to the victims listed in the indictments for case numbers F-13913 and F-13974, it is not clear from the record how Mr. Holland was involved in the offenses to which Petitioner pled guilty or why Mr. Holland was charged in Coffee County rather than Warren County.

[3] It is unclear from the record whether Mr. Stanford's reference to "some of the matters" meant Petitioner's cases.

Lee Nettles testified that he owned a private investigation company, ICT Investigations, in Manchester. Mr. Nettles explained that he had seventeen years' prior experience in law enforcement before beginning his work as a private investigator. Mr. Nettles recalled that Petitioner's parents hired him in July 2013, along with Mr. Stanford, to assist with Petitioner's defense. The following month, Mr. Nettles accompanied Mr. Stanford to the prison in West Tennessee where Petitioner was being housed before trial and met with Petitioner for three hours to discuss the cases against Petitioner. Mr. Nettles recalled that, during the meeting, Petitioner asked him to investigate Mr. Holland's culpability in the burglaries and thefts. They "talked about each one of the[] [Petitioner's] individual cases and different pieces of stolen property that was at Mr. Holland's that . . . went to other people that [were] in the community." In August 2013, Mr. Nettles began conducting "computer intel work" on individuals who were supposed to be in possession of stolen property they received from Mr. Holland. Mr. Nettles attempted to find them, interview them, and tie the stolen items "back to Mr. Holland and see what it had to do with [Petitioner]." Mr. Nettles noted that Mr. Holland made statements to the Warren County Sheriff's Department and the McMinnville City Police Department indicating that he was involved "in this stolen property." Following Petitioner's plea, Mr. Nettles took the information about Mr. Holland that he found through his investigation to the Coffee County Sheriff's Department.

Mr. Nettles recalled that he received letters from Petitioner, and he met with Petitioner's parents multiple times. Additionally, Petitioner's parents indicated to Mr. Nettles that they were communicating with Petitioner regarding his cases during their prison visitations. Mr. Nettles testified that he learned on September 3, 2013, that the State intended to take case number F-13913 to trial first, and Mr. Stanford instructed him to focus on that case. Mr. Nettles agreed that Mr. Holland had given two statements to law enforcement regarding stolen property, but he stated that Mr. Holland "[d]idn't have anything to do with the burglary from [F-]13913." Mr. Nettles explained, "I had [Petitioner's] theory about what happened [in case number F-13913]. So I began to investigate it." He interviewed Sandy Bratcher and obtained a statement from her in October 2013. Petitioner told Mr. Nettles that Ms. Bratcher was present on the night Petitioner allegedly burglarized the victim's home. However, when Mr. Nettles spoke to her, Ms. Bratcher denied knowing Petitioner. Mr. Nettles stated that he had known that Ms. Bratcher had been in jail in Warren County, but he was unaware of the nature of the charges. Mr. Nettles explained that he also interviewed another potential witness, Sheila Thompson.

Mr. Nettles recalled that Petitioner was "very specific" in the information that he provided Mr. Nettles and Mr. Stanford. Mr. Nettles said that eventually some stolen property was recovered, but he could not recall "which burglaries they came from[.]" Mr. Nettles investigated Petitioner's cases for about sixty hours prior to Petitioner's

entering a plea. Mr. Nettles explained that Petitioner's parents paid him additional money after Petitioner's plea to locate more of the stolen property, hoping that it would "help [Petitioner] get parole." Accordingly, Mr. Nettles pursued the information received from Petitioner with the Coffee County Sheriff's Department. Mr. Nettles explained that the property eventually recovered was not the stolen property at issue in case number F-13913. Mr. Nettles stated that Mr. Holland was later indicted based on the information provided by Petitioner.

Barry McCormick testified that he first met Petitioner in December 2012, at the Warren County Jail. Mr. McCormick explained that he was Petitioner's cellmate for several months. He recalled that Petitioner was "just emotionally wrecked" one day, after Petitioner spoke to Investigator Rowland and Mr. Roller. Mr. McCormick claimed that Petitioner began hallucinating, hearing voices, and Petitioner was paranoid that others were going to hurt him. Mr. McCormick recalled that Petitioner was sent to segregation for a few days after this event.

Dr. David Solovey, an expert in clinical psychology, testified that he had been hired to conduct a mental evaluation of Petitioner prior to the post-conviction hearing. Dr. Solovey stated that he conducted the seven-and-a-half-hour evaluation on November 21, 2015. He interviewed Petitioner at the Bledsoe Correctional Complex, and he also reviewed "some extensive mental health records" that were obtained from the Social Security Administration and prior treatment facilities. Dr. Solovey testified that his review of the records showed that Petitioner had a "significant history dating back to elementary school." From 1999 to 2012, Petitioner had twenty-one psychiatric hospitalizations. The records indicated that Petitioner had "a variety of diagnoses ranging from psychosis, suicidal depression, paranoia, post-traumatic stress disorder, [and] chemical dependency." Dr. Solovey testified that Petitioner had been prescribed mood stabilizers, anti-depressants, and anti-psychotic medications at various times throughout his life.

Dr. Solovey stated that he diagnosed Petitioner as having a "schizoaffective disorder which can be called a number of different things like bipolar disorder or mood disorder and their underlying psychotic processes." According to Dr. Solovey, Petitioner provided a history of the days leading up to his entering the plea—"a Thursday, Friday, and then a weekend and then a Monday." Petitioner reported that it was a "very stressful" time and that he felt increasing stress and pressure to enter the plea. Petitioner explained to Dr. Solovey:

> Well, it was at first before it started he was fairly uplifted thinking that things were going to be okay and then the police started coming in and there was some reference to ATF and then the potential threat of having

something even worse occur, wasn't allowed to talk to his parents. He wanted to talk to them to at least get some neutral person to discuss what it was all about and he felt there was just an absolute I have to do this or else.

According to Dr. Solovey, Petitioner reported that he was taking an anti-depressant while in prison, but he was not receiving an anti-psychotic medication. Dr. Solovey stated that the lack of medication would have "really ma[d]e things much more difficult for [Petitioner]." Dr. Solovey opined that Petitioner's repeated hospitalizations should have been "red flags" for counsel indicating that Petitioner needed to be evaluated for competency to stand trial and to determine Petitioner's mental health status at the time of his plea "to see whether it would be knowingly and fully reasonably entered." The following exchange occurred during Dr. Solovey's direct examination:

> Q. And sir, also pursuant to your evaluation you formed an opinion as to whether [Petitioner's] guilty pleas were knowingly and voluntarily entered, did you not?
>
> A. I feel the pressure was there. He was poorly medicated and given that history that was just ever present that I think a full psychiatric evaluation or psychological forensic evaluation would have been relevant at least to determine that.

When asked again if Petitioner's plea was knowing and voluntary, Dr. Solvey responded that Petitioner "needed quite a bit more to really fully consider that before standing before court."

On cross-examination, Dr. Solovey acknowledged that the medical records indicated various treatment plans for Petitioner, which were appropriate for Petitioner's diagnosis. Dr. Solovey also stated that the results of his evaluation reflected Petitioner's condition on November 21, 2015, but that the results were consistent with Petitioner's history. Dr. Solovey tested Petitioner for competency to stand trial and found that Petitioner was competent. He agreed that factors contributing to Petitioner's competency were the structured prison environment and being properly medicated. Dr. Solovey agreed that Petitioner's medical records indicated that Petitioner was being properly medicated prior to his plea, but Petitioner told Dr. Solovey that he was un-medicated on the day of the plea. Dr. Solovey opined that Petitioner had the capacity to understand what would be in his "best interest" but that,

> when that agreement was made that was not a good time for [Petitioner], that was not what you would call a reasonable . . . appropriate time where he could fully consider everything that was going on and everything that

was involved with his plea, that he was probably . . . quite disturbed at that time.

Petitioner's father, Rodney Aho, testified that Petitioner had mental health problems beginning at an early age. Mr. Aho agreed that Petitioner also struggled with drug addictions and had a lengthy criminal record. Mr. Aho testified that he told Mr. Sharp, Mr. Roller, and Mr. Stanford about Petitioner's mental health issues. He stated that Mr. Roller's representation of Petitioner ended on bad terms, and Mr. Aho filed an ethical complaint against Mr. Roller with the BPR; Mr. Roller had to provide Mr. Aho a refund of $3,700 as a result of the complaint. Mr. Aho recalled that he offered to set up a phone account for Mr. Nettles to talk to Petitioner, but Mr. Nettles said that "it wasn't necessary now." Mr. Aho stated that the only direct communication Petitioner had with Mr. Nettles and Mr. Stanford before January 2014 was the three-hour meeting at the prison in West Tennessee. Mr. Aho recalled that, after Petitioner was transported to the Warren County Jail in January 2014, he was able to speak to Petitioner over the telephone at least two times before Petitioner entered his guilty plea. However, Mr. Aho explained, "We really didn't talk about a plea agreement. We . . . knew he was really upset and he said, ['T]hey're not working with us, they're not going to give us what we want.[']" During his phone calls with Petitioner before the plea, Mr. Aho "could tell [Petitioner] was stressed out and ready to cry[.]" Mr. Aho testified, "I think [Petitioner] felt at that time that [Mr.] Stanford wasn't going to do anything for him, wasn't going to go to trial." He claimed that he had very little communication with Mr. Nettles and Mr. Stanford, although he recalled at least one meeting with Mr. Nettles at the Aho's residence. Mr. Aho also met with Mr. Nettles at least three times at Mr. Nettles' office, and he met with Mr. Stanford two or three times at Mr. Stanford's office. Mr. Aho stated that he paid Mr. Nettles additional money after Petitioner's plea to further investigate items of stolen property, which led to Mr. Holland's arrest and conviction.

Petitioner testified that he "had no choice" when he entered best interest pleas in case number F-13913 and F-13974. Mr. Sharp initially represented Petitioner, and Petitioner informed Mr. Sharp of his mental health history. Petitioner also told Mr. Sharp that he had information that would help the State prosecute other cases. At Petitioner's arraignment hearing, Mr. Sharp told Petitioner to share the information with the State. Later, Mr. Sharp visited Petitioner while Petitioner was incarcerated in the Warren County Jail. Petitioner testified that, during this visit, Mr. Sharp told Petitioner that he "ran his mouth too much" while they were standing at the booking area. Petitioner testified that, after this interaction, he ended Mr. Sharp's representation. Petitioner spoke with Mr. Roller about representing him, and he informed Mr. Roller of his mental health history. Petitioner informed Mr. Roller that he was receiving treatment for depression, bipolar disorder, and post-traumatic stress disorder. Mr. Roller did not advise that Petitioner should receive a forensic evaluation. Petitioner asked Mr. Roller to schedule a

- 12 -

meeting with the State and gave Mr. Roller a letter from Barry McCormick that discussed the location of stolen property. Petitioner gave Mr. Roller the letter hoping that the State would recover the stolen property and charge Mr. Holland. Petitioner testified that Mr. Roller did not use the letter in his case. Petitioner stated that Mr. Roller's inaction made him feel helpless, and he did not have confidence in Mr. Roller's representation. Petitioner testified that he never received discovery until he ended Mr. Roller's representation.

On February 15, 2013, Mr. Roller brought two investigators to meet with Petitioner at the jail. Petitioner hoped to arrange for immunity in exchange for the information he had about the stolen property; however, no agreement was reached. Petitioner told the investigators about seeing Mr. Holland with the stolen property, and Mr. Roller never advised him to end the interview. At Petitioner's arraignment hearing on February 27, 2013, Mr. Roller said he would visit Petitioner, but he did not. Mr. Roller met with Petitioner on March 15, 2013, and after this meeting, Petitioner "snapped" and became depressed and paranoid. Petitioner believed that other inmates were going to attack him, and he was placed in solitary confinement for seven days. On April 5, 2013, Petitioner met with Mr. Roller for the last time. At this meeting, Mr. Roller gave Petitioner his discovery. Petitioner testified that Mr. Roller only investigated one witness, Monica Burgess, for his cases.

Petitioner's parents later hired Mr. Stanford to represent him. Mr. Stanford and the defense investigator, Mr. Nettles, met with Petitioner while he was incarcerated in West Tennessee in August 2013. Petitioner informed Mr. Stanford that he was taking Paxil for his mental health issues. Mr. Stanford discussed with Petitioner whether Petitioner should testify at trial, but Mr. Stanford did not file a motion to limit the State's ability to impeach Petitioner with his prior convictions. Petitioner believed that his cases were proceeding to trial, and he asked Mr. Stanford to follow leads regarding the stolen property. The only contact that Petitioner received from Mr. Stanford between the initial meeting and his plea submission was a letter that Mr. Stanford wrote to the State requesting to extend the trial date and to conduct fingerprint testing. On November 20, 2013, Petitioner wrote a letter to Mr. Stanford asking Mr. Stanford to investigate the stolen property tied to Mr. Holland and requesting a mental health evaluation. Mr. Stanford never responded to this letter. In January 2015, Petitioner was transferred to the Warren County Jail for his trial. Mr. Stanford and Mr. Nettles met with Petitioner on January 22, 2015. During this meeting, Petitioner believed that he was going to trial, and he felt that a positive outcome was likely. Mr. Stanford conveyed a plea agreement to the Petitioner with a twenty-five year sentence. Petitioner also discussed his other cases with Mr. Stanford and Mr. Nettles.

The next day, Mr. Stanford and Mr. Nettles met with Petitioner again, and Mr. Nettles told Petitioner that he could receive federal charges for gun offenses. Mr. Stanford conveyed a new plea agreement to the Petitioner for a sentence of thirty years. Regarding his mental state at this time, the Petitioner stated, "[T]he way they pushed it and switched up on me there was no way in the world I could have went to court with them to represent me and come out good. I would have been done [sic] worse than what they were trying to do." Mr. Nettles informed Petitioner that he had not subpoenaed any witnesses. Petitioner stated that he felt that he had no choice but to enter a plea. Petitioner began to sign the plea but asked to speak with his parents. Mr. Stanford contacted the State, and around 3:27 p.m., Mr. Stanford informed Petitioner that the trial court stated that the plea needed to be submitted by 4:00 p.m. Petitioner agreed that, at the plea submission hearing, he testified that he "thoroughly" discussed the plea agreement with Mr. Stanford. Petitioner noted that he had never proceeded to trial on any of his previous criminal charges.

On cross-examination, Petitioner agreed that he had a lengthy criminal history. Petitioner also agreed that he understood the State's allegations in case numbers F-13913 and F-13974. Petitioner agreed that he discussed these charges with his three attorneys. Petitioner agreed that a witness in case number F-13913 had observed him at the offense scene and identified him at the preliminary hearing. He also agreed that this witness could have testified at his trial. Petitioner stated that, when he signed the plea agreement documents, he understood what the terms of the agreement were. Petitioner agreed that he testified during the plea submission hearing that no one had promised or threatened anything to coerce him into entering a plea. On redirect examination, Petitioner testified that he did not voluntarily enter his plea.

At the conclusion of the hearing, the post-conviction court found that Petitioner's first two attorneys did not affect Petitioner's case. The post-conviction court also found that there was no evidence that "that Mr. Stanford and Mr. Nettles could have provided some witnesses or statements or something to [Petitioner] or to the court that would have significantly changed the outcome of the case as far as what they discovered." The post-conviction court found that Mr. Stanford was prepared for trial and that Mr. Nettles was prepared to subpoena a defense witness to testify at trial. The post-conviction court further noted that Mr. Stanford and the State agreed to continue Petitioner's trial if Petitioner rejected the plea agreement and that the trial court would not have opposed this agreement to continue. The post-conviction court found that there was no evidence that witnesses existed that could have testified at trial to impeach the State's witnesses. The post-conviction court found that Mr. Stanford's representation was deficient for failing to file a motion to exclude Petitioner's prior record for impeachment purposes. However, the post-conviction court concluded that the motion would not have affected Petitioner's

case because some of Petitioner's prior convictions were admissible. The post-conviction court concluded that Petitioner did not receive ineffective assistance of counsel.

Regarding the voluntariness of Petitioner's plea, the post-conviction court found that Petitioner appeared to be competent when he entered his best interest plea. The post-conviction court also found that, during the plea submission hearing, Petitioner "was very alert and understanding and there was no question that he appeared to know what he was doing." The post-conviction court noted that Dr. Solovey testified that Petitioner had depression, bipolar disorder, and post-traumatic stress disorder. However, the post-conviction court concluded that Mr. Stanford's representation was not ineffective for failing to request a mental health evaluation for Petitioner "because he didn't see anything that caused him to believe that [Petitioner] was not competent."

Following the hearing, the post-conviction court entered a written order of its findings of fact and conclusions of law and denied post-conviction relief. This timely appeal follows.

*Analysis*

On appeal, Petitioner contends that Mr. Stanford rendered ineffective assistance based on counsel's failure to issue subpoenas, file motions, and respond to the State's motion to use Petitioner's prior convictions as impeachment evidence. Additionally, Petitioner alleges that he gave Mr. Stanford and Mr. Nettles "the tools they needed to secure a sound defense" by providing them with information about Mr. Holland but that Mr. Stanford and Mr. Nettles failed to investigate that lead until after Petitioner's plea. Petitioner further asserts that Mr. Stanford and Mr. Nettles used unreasonable persuasion to get Petitioner to sign the agreement. Petitioner asserts that they threatened him with a federal firearms charge if he did not accept the State's offer when "[l]ittle to no proof was available to the government to support such a charge[,]" and Mr. Stanford failed to relay to Petitioner the possibility of a continuance. The State responds that the post-conviction court properly denied Petitioner relief on his claim that his plea was involuntarily and unknowingly entered due to ineffective assistance of counsel.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such

- 15 -

findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong

of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Don Allen Rodgers v. State*, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *4 (Tenn. Crim. App. April 26, 2012), *no perm app. filed*. First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. *See Hill*, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

Whether a guilty plea is intelligent and voluntary is a mixed question of law and fact. *Jaco*, 120 S.W.3d at 830-31. Therefore, in such cases we review the post-conviction court's findings of fact *de novo* with a presumption of correctness. *Id.* The post-conviction court's findings of law are reviewed purely *de novo*. *Id.*

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard as announced in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *Don Allen Rodgers*, 2012 WL 1478764, at *5. Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." *Boykin*, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e. that he has been made aware of the significant consequences of such a plea . . . ." *Mackey*, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . ." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin*, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904; *Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conculsory allegations unsupported by specifics." *Id.* at 74.

Ineffective Assistance of Counsel

Petitioner contends that Mr. Stanford rendered ineffective assistance based on counsel's failure to adequately prepare for trial. He asserts that Mr. Stanford failed to issue subpoenas, investigate Mr. Holland, and respond to the State's motion to use Petitioner's prior convictions as impeachment evidence.

The record reflects that, after they were retained, Mr. Stanford and Mr. Nettles obtained a copy of the State's discovery and met with Petitioner for three hours. Petitioner was adamant that Mr. Holland was criminally responsible for the offenses pending against Petitioner. Based on Petitioner's assertions regarding Mr. Holland's involvement, Mr. Stanford and Mr. Nettles investigated people "surrounding Joe Holland." Mr. Stanford believed that it would be helpful to talk to Mr. Holland's associates because they might be more willing to share information that Mr. Holland was the person who had committed the crimes. Mr. Nettles spent over sixty hours investigating Petitioner's cases prior to the plea. Mr. Nettles interviewed multiple witnesses, including Sandy Bratcher, Monica Burgess, and Sheila Thompson. He conducted "computer intel work" on the individuals who were supposed to be in possession of stolen items received from Mr. Holland. Mr. Nettles attempted to find them, interview them, and tie the stolen items "back to Mr. Holland and see what it had to do with [Petitioner]." Mr. Nettles agreed that Mr. Holland was later indicted based on the

information provided by Petitioner, but he stated that Mr. Holland "[d]idn't have anything to do with the burglary from [F-]13913." He explained that the property eventually recovered was not the stolen property at issue in case number F-13913.

When the State elected to proceed to trial first on case number F-13913, Mr. Stanford testified that he made a "strategic decision" that he and Mr. Nettles needed to focus the investigation on the individuals involved in that case. Mr. Stanford recalled that the victim in case number F-13913 was "clear as [] could be that it was [Petitioner]" who had been in her driveway. Mr. Stanford met with Petitioner at the Warren County Jail after Petitioner was transferred to the jail about a week before trial. He met with Petitioner "several times in a three[-]day period" to prepare Petitioner for trial. Mr. Stanford explained that he had not subpoenaed witnesses because the defense investigation did not discover any witnesses other than Shelia Thompson and character witnesses like Petitioner's parents. He explained that Ms. Thompson was the only witness that the defense could find that corroborated Petitioner's version of events, but she would have "basically regurgitated . . . what [Petitioner] had told her[.]" Mr. Stanford testified that he approached the State about a potential plea agreement and worked for several days with the prosecutor to reach an agreement that was in Petitioner's best interest. Mr. Stanford testified that he knew the prosecutor would not object to a continuance of the trial if plea negotiations broke down, and Mr. Stanford told Petitioner about a possible continuance.

We agree with the post-conviction court that Mr. Stanford was prepared for trial and was prepared to subpoena at least one witness to testify on Petitioner's behalf if the case went to trial. Mr. Stanford communicated to Petitioner that the State agreed to continue Petitioner's trial if Petitioner rejected the plea agreement and that the trial court would not have opposed this agreement to continue. Moreover, the record shows that Petitioner's defense team adequately investigated the background of Mr. Holland, and Mr. Stanford was prepared to effectively cross-examine him. Petitioner failed to establish or explain how evidence of Mr. Holland's apparent involvement in some of the thefts would have affected his decision to go to trial in case number F-13913. Mr. Nettles testified that Mr. Holland had no involvement in case number F-13913, and Mr. Stanford stated that the victim in that case was "clear as [she] could be that it was [Petitioner]" who had been in her driveway at the time of the burglary. Although in his brief Petitioner characterizes Mr. Holland as a key witness for the State in case number F-13974, the evidence presented at the hearing fails to establish this claim. Moreover, it is not clear from the record what additional charges Petitioner was facing in case numbers F-13975, F-13976, and F-13977, which were dismissed by the State as part of Petitioner's plea agreement, or the strength of the evidence against Petitioner in those cases. It is, therefore, impossible for this court to conclude that but for trial counsel's alleged errors,

Petitioner "would not have pleaded guilty and would have insisted on going to trial" in these cases. *Hill*, 474 U.S. at 59. Petitioner is not entitled to relief.

Regarding Petitioner's claim that Mr. Stanford was ineffective for failing to respond to the State's motion to use Petitioner's prior convictions as impeachment evidence, the post-conviction court concluded that Mr. Stanford's performance was deficient but that Petitioner was not prejudiced "because some, if not several, of Petitioner's prior convictions would have been allowed by the [trial court] for impeachment." We agree with the post-conviction court's assessment that Petitioner failed to establish prejudice. The State's "Notice of Intent to Use Conviction for Impeachment" reflects that Petitioner had a total of thirty-two prior convictions, the majority of which were felony convictions. The Petitioner failed to establish that, had Mr. Stanford filed a motion challenging the State's notice, the trial court would have precluded the State's use of Petitioner's prior convictions as impeachment. Accordingly, Petitioner has not shown that he was denied the effective assistance of counsel, and he is not entitled to relief.

Unknowing and Involuntary Guilty Plea

Petitioner further asserts that trial counsel and the defense investigator used unreasonable persuasion to get Petitioner to sign the agreement. Petitioner asserts that they threatened him with a federal firearms charge if he did not accept the State's offer when "[l]ittle to no proof was available to the government to support such a charge."

Here, the record reflects that, during the defense investigation, Mr. Stanford and Mr. Nettles learned that the State had a witness that would testify that Petitioner had possession of a weapon. Mr. Stanford explained that the witness indicated Petitioner tried to give her two firearms, which were a part of one of the cases pending against Petitioner. Because of his substantial practice in federal court, Mr. Stanford was "very concerned" that the federal prosecutors might seek to charge Petitioner under the Armed Career Criminal Act, in which case Petitioner "would have been looking at . . . probably [thirty] to life." When Mr. Stanford approached the State about plea negotiations, Mr. Stanford had a "gentlemen's agreement" with the prosecutor that the prosecutor would not report the firearms offense to the federal prosecutors. Mr. Stanford indicated that this was a "big part" of why Petitioner chose to plead guilty to the two indictments.

The guilty plea hearing transcript reflects that, when questioned by the trial court, Petitioner agreed that he went over the plea documents in both cases "thoroughly" with trial counsel. Petitioner testified that he understood the nature of the charges to which the pleas were offered, the minimum and maximum sentence on each charge if convicted, his right to counsel at every stage of the proceedings, his right to plead not guilty, his right to

a jury trial, his right to confront adverse witnesses and bring his own witnesses, his right to remain silent, and his right to appeal any resulting conviction or sentence. In accepting the terms of the plea agreement, Petitioner affirmed that he was waiving each of those rights. He also agreed that he was entering his pleas freely and voluntarily. Petitioner denied that he was entering the pleas because he had been threatened to do so. The trial court found that Petitioner understood his rights and made a knowing, voluntary, and understanding waiver of his rights by pleading guilty.

Upon review, we agree with the post-conviction court's assessment that Petitioner's best interest pleas were entered knowingly and voluntarily. Mr. Stanford testified that Petitioner was able to write very coherently, was able to pass along volumes of information to him about the cases (such as specific times and the people involved), understood the potential sentences he was facing, and understood that additional charges could possibly result from his alleged possession of a firearm based on his previous felony convictions. Petitioner declared in open court that his plea was knowing and voluntary, and the post-conviction court recalled that the Petitioner was very alert during said plea process such that there was no question that he appeared to know and understand what he was doing. The record also shows that Petitioner had a very extensive criminal record and great familiarity with the criminal justice system. Petitioner entered his guilty plea to avoid a greater penalty that might have resulted had Petitioner's cases proceeded to trial, as well as to avoid the possibility of a federal firearms charge. That Petitioner was facing the possibility of a lengthier sentence if convicted at trial did not render his plea involuntary. *See Blankenship*, 858 S.W.2d at 904. Under the totality of the circumstances, Petitioner's plea was knowingly and voluntarily entered. He is not entitled to post-conviction relief on this claim.

CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the post-conviction court's denial of Petitioner's petition for post-conviction relief.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 21 -